# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DREW W. FREDERICK, et al.      )
                                      )
                   Plaintiffs,    )
                                        )
      vs.                     )     Case No. 10-1063-JAR
                                        )
SOUTHERN STAR CENTRAL GAS    )
PIPELINE, INC.,                )
                                        )
                   Defendant.   )

## MEMORANDUM AND ORDER

Plaintiffs in this case are seeking equitable reformation and declaratory judgment with respect to the annual payment required to exercise annual options in the natural gas storage leases under which Plaintiffs are lessors and Defendant Southern Star is lessee. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 110). The motion is fully briefed and the Court is prepared to rule. As described more fully below, the Court grants Defendant's motion for summary judgment.

## I.      Motion to File Surreply

Plaintiffs seek leave to file a surreply to the motion for summary judgment, arguing that Southern Star's reply brief raised two new arguments: 1) that the factual basis for reformation does not show a present hardship; and 2) that Plaintiffs' reformation theory violates public policy. Southern Star did allege in its memorandum in support of summary judgment a lack of hardship factors in the present case. Southern Star argues that its public policy argument in its reply brief "was asserted in response to plaintiff's re-characterized and expanded claim that

reformation could be based even upon industry changes."[1]  Because Southern Star relies on the new public policy argument in its reply brief, the Court will grant Plaintiffs' motion to file their surreply.  "[I]f the court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials."[2]  Therefore, for purposes of the instant motion for summary judgment, the Court will consider Plaintiffs' Sur-Reply that is attached to its motion.

## II.    Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiffs.[3]

*The parties and the Alden Field*

Defendant Southern Star ("Southern Star") owns and operates a natural gas storage field located in Rice County, Kansas ("the Alden Field"), as authorized by Certificates of Public Convenience and Necessity issued by the Federal Energy Regulatory Commission ("FERC").  The Alden Field encompasses all of Sections 15, 21, and 22, and portions of Sections 9, 10, 16, 27, and 28 in Township 21 South, Range 9 West, Rice County, Kansas.  There are currently thirty-three gas storage leases for this acreage in the Alden Field.  Southern Star is the current "Lessee" and operator of the gas storage leases located within the certificated boundaries of the Alden Field.  Plaintiffs are owners of mineral and/or surface rights in some of the acreage within the Alden Field and are "Lessors" of the seventeen Alden Field gas storage leases that are the

---

[1]Doc. 132 at 2.

[2]*Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (citations omitted).

[3]*See* Pretrial Order (Doc. 125); Memorandum in Support of Defendant's Motion for Summary Judgment (Doc. 111); and Plaintiffs' Response to Southern Star's Motion for Summary Judgment (Doc. 119).

2

subject of this case (the "gas storage leases"). Over the term of the gas storage leases, Southern Star and its predecessors have always used the subject properties for gas storage, and their use of the subject properties has not changed over time.

*Pertinent terms of the gas storage leases*

All of the gas storage leases provide for the lease by Southern Star of the land described therein "lying above the top of the Viola lime," or comparable subsurface geological formations, exclusively for the purpose of natural gas storage and associated activities. All but one of Plaintiffs' natural gas storage leases gave Southern Star the right to store natural gas during a primary term of fifty years. The one exception was a ten year primary term, which expired in 1983.

Each of the seventeen leases contained language that gave a "repeated annual option to extend and continue this lease for and during each repeated annual period, after the expiration of said primary term, upon the same terms and provisions applicable for and during said primary term, including each repeated annual option." The amount provided in the leases to be paid during the primary term and for the exercise of subsequent annual options was $1 per acre per year. The yearly rental in each lease is referred to as an "annual payment." The paragraph of each lease that provides for an annual payment to exercise the yearly option contains the following language:

> It is agreed that the consideration recited in paragraph 1 hereof, together with the herein provided annual payment, shall operate, cover and be held to be full consideration and compensation to Lessor for all privileges, rights and each option granted lessees under this lease, except only as otherwise expressly provided in this lease.

None of the Plaintiffs' leases contain any provision for upward adjustments for inflation

or on any other basis.  Under the subject leases, the only basis for exercising the annual option is by making a $1 per acre per year "annual payment" and "being engaged in any one of the purposes of the lease upon said land or upon land in the vicinity thereof."

All of the gas storage leases provide that Southern Star will, at the landowner's request, deliver free and/or reduced-price natural gas to the principal dwelling on the leased property ("Domestic Gas"), under conditions specified in the leases—either the existence of an observation well on the premises or upon circumstances that might exist "until a well exists on the premises."  For purposes of this Memorandum and Order, "Domestic Gas" is defined as free and/or reduced-price natural gas to the principal dwellings on the properties subject to Plaintiffs' gas storage leases.  All of the gas storage leases at issue in this case contain provisions obligating Southern Star to deliver some quantity of Domestic Gas, provided that terms and conditions specified in the gas storage leases are met.  Some of the leases provide for 250,000 Mcf[4] of Domestic Gas free annually and additional gas above that volume for only $.50 per Mcf; others require the lessor to pay $.50 per Mcf for all Domestic Gas received.

*Plaintiffs' Claims*

Plaintiffs make no claim that there was fraud, coercion or duress in the negotiation, acquisition, or execution of the gas storage leases.  Plaintiffs make no claim that the negotiation, acquisition, or execution of the gas storage leases was based on a mutual mistake of fact between the parties.

Plaintiffs seek reformation of the gas storage leases "in a manner which requires Southern Star to tender payments to exercise its annual option in an amount determined to be fair

---

[4]Mcf refers to 1000 cubic feet.

and reasonable at current market value rates for underground natural gas storage."  Plaintiffs

assert further that the "current market value for gas storage leases is multiple times the one dollar

an acre being currently paid by Southern Star."  Plaintiffs also seek a declaratory judgment

holding that the storage leases should be reformed "to require Southern Star to tender payments

to exercise the annual option in an amount determined to be fair and reasonable at current market

value rates for underground natural gas storage."

Plaintiffs seek relief because of numerous changes in the natural gas business that "were

neither anticipated nor reasonably foreseeable" . . . and because "[t]he Storage Leases as written

drive too hard of a bargain to be enforced and are unconscionable and inequitable."  Among the

changes alleged to have been neither anticipated nor reasonably foreseeable were:[5]

a.  "dramatic and marked changes in the natural gas business, including but not limited to

deregulation and unbundling of services as mandated by FERC Order 436 in 1985 and Order 636

in 1992, the growth and development of marketing subsidiaries, the direct sale of natural gas

from producers to consumers, and other dramatic changes in the natural gas and natural gas

storage business";

b.  "dramatic and unexpected changes in the energy industry generally, the value of

energy and the value of natural gas"; and

c.  "dramatic increases in the price of natural gas and the value of amounts paid for

rentals of natural gas storage."

With respect to the Domestic Gas provisions in the gas storage leases that give Plaintiffs

the right to free and/or reduced-price natural gas to their principal dwellings on the leased

---

[5]*See* Doc. 119 at 7.

properties, Plaintiffs contend: "The free house gas clause is an independent clause and a separate contractual obligation of the lessee and lessee cannot avoid its express duty under the contract to provide free house gas."

*Plaintiffs' experts' opinions*[6]

One of Plaintiffs' experts is S. Wesley Haun, who describes himself as "an independent natural gas consultant with experience in the natural gas industry since 1977."[7] Haun was retained to "examine the regulatory changes in the prices, structure, and services provided utilizing storage assets" in the period from 1959 to the present, and "to determine if such changes would have been expected or foreseeable in 1959."[8] Haun concludes that the natural gas industry "has been completely restructured in substantial ways by federal regulatory changes" that occurred subsequent to 1959 when many of the gas storage leases at issue were executed.[9] He describes those federal regulatory changes in detail, which he identifies as the Natural Gas Policy Act of 1978 ("NGPA"), FERC Order 380, FERC Order 436 (in 1985), FERC Order 500 (in 1987), and FERC Order 636 (in 1992).[10] Haun states: "The movement from the NGPA of 1978 to the FERC Orders 380, 436-500, and 636 completed the restructuring of the natural gas industry on both commodity pricing and on bundled services and facilities."[11] Haun

---

[6]Although Southern Star did not contest the facts pertaining to Plaintiffs' experts' opinions for purposes of summary judgment, Southern Star did not waive its right to challenge those opinions through *Daubert* motions or otherwise.

[7]Doc. 111–19 at 4.

[8]*Id.* at 6.

[9]*Id.* at 7.

[10]*Id.* at 10–14.

[11]*Id.* at 14.

concludes further that "no entity or person in 1959 could have foreseen the eventual restructuring and deregulation of the natural gas industry."[12]

Plaintiffs have also retained William A. Henry, a consultant "for midstream operations, management, storage, regulatory and permit services."[13] Henry agrees with Haun that "substantial changes have occurred in the nature of the natural gas storage business since 1959 which were not foreseeable at that time, either to the landowner or the storage operator."[14] Consistent with Haun, Henry notes that FERC deregulated pipelines "with several Orders ending with FERC Order 636" in 1992.[15] Henry also opines that a per acre gas storage rental payment of $1 per acre is not a "fair current rental value," and that the "current fair rental value is best ascertained by a rental payment in an amount provided in the Manual of Gas Storage utilized by the United States Bureau of Land Management."[16]

*Free and reduced-price natural gas*

The average annual residential natural gas rate in Kansas in 1967 (the first year for which the Energy Information Administration ("EIA") posted rates) was $1.04 per Mcf, and would have been even lower than that in 1959. The average annual residential natural gas rate in Kansas rose to as high as $13.89 per Mcf in 2008 and the EIA's most current (June 2012) rate is approximately $14.23 per Mcf.

Plaintiffs Howard Partington and Shirley Fair admit they own property that received

---

[12]*Id.* at 7.

[13]Docs. 111–20 and 111–21.

[14]Doc. 111–20 at 4.

[15]*Id.* at 5.

[16]*Id.* at 4.

Domestic Gas from Southern Star and its predecessors from approximately 1959 until 1999. Almost all of the gas received was delivered free of charge (the free gas maximum volume was only exceeded in two years; $.50 per Mcf was paid for the excess volume).

Plaintiffs Wendell and Sheryl Carter own three properties that are currently receiving Domestic Gas from Southern Star (Lease #32593 since October 2001; Lease #32594 since November 2007; and Lease #32639 since October 1993). The Domestic Gas delivered to Lease #32639 is reduced-price gas at $.50 per Mcf. The rest of the Domestic Gas is delivered free of charge. To date, all three properties continue to receive Domestic Gas.

The total market value (applying EIA rates) of the Domestic Gas that Southern Star or its predecessors would have been obligated to supply free of charge to the Plaintiffs and their predecessors, if each of them had complied with the conditions for and demanded the maximum free gas quantity specified in their respective gas storage lease from the date of execution, until December 31, 2011 is $1,111,558.[17]

*Circumstances that were not reasonably foreseeable at the time the leases were executed*

At the time the leases were executed, Southern Star's predecessor, Cities Service Gas Company, was a wholly regulated utility, exercising a merchant function in which its rates included the costs for gas, gathering, treating, processing, storage, transporting, etc., plus a reasonable rate of return.[18] Mr. Haun's assignment was to determine if there have been substantial changes in the prices, structure, and services provided utilizing storage assets since 1959. He was also asked to determine if such changes would have been expected or foreseeable in 1959.

---

[17]Doc. 111-24, Affidavit of Kevin Gray, ¶8 and Attachment B thereto.

[18]Doc. 111–19 at 10–11.

Mr. Haun's opinion is that the natural gas industry has been completely restructured in substantial ways by federal regulatory changes ordered by the FERC, and that the "changes took the natural gas pipeline industry from a regulated, utility model of bundled rates and services, to a market priced commodity. . . ."[19] Mr. Haun further expressed his opinion that "[n]o entity or person in 1959 could have foreseen the eventual restructuring and deregulation of the natural gas industry . . . ."[20]

Among the many things which happened in the years after 1959 were the passage of the NGPA of 1978, issuance of orders by the FERC numbered 380, 436, 500 and FERC order 636 in 1992 which "totally restructured the natural gas industry."[21]

Plaintiffs' expert William Henry also stated his opinion that substantial changes have occurred in the gas storage business since 1959 which were not foreseeable at that time, either to the landowner or the storage company.[22]

Plaintiffs served a Deposition Notice pursuant to Fed. R. Civ. P. 30(b)(6) on Southern Star which, inter alia, requested that Southern Star produce a witness who was able to testify to the manner in which certain risks associated with the operation of the Alden Storage Field have changed during the life of the field and Southern Star's ability to foresee such risks in the past or in the future.[23] Philip Rullman, Southern Star's Vice-President and Chief Commercial Services Officer, was unable to testify about the operation of the storage field and applicable tariffs before

---

[19]*Id.* at 7.

[20]*Id.*

[21]*Id.* at 11–14.

[22]Doc. 111–20 at 4.

[23]Doc. 119–4.

Rule 636 was issued and the company was unable to produce any witness with knowledge of the time period before Mr. Rullman's personal knowledge.[24]

Southern Star has identified one expert in this case, Bernie Shaner, an appraiser. He offers no opinion on whether or not substantial changes occurred that would affect fair value or whether such changes were foreseeable at the time the leases were entered.[25]

Southern Star's Sr. Vice President Operations and Technical Services stated in a sworn affidavit filed in this case that:

> Absent unanticipated future events precluding such activities, Southern Star intends to continue to utilize the Alden Field and to pay the annual rentals required each year to continue the Subject Lease in effect for at least another fifty years into the future.[26]

The $1 per acre per year flat rental rate established in the Plaintiffs' leases in 1959 and anticipated to be in effect for another fifty years, currently has the buying power of $0.13 in 1959 Dollars.

Prior to 1978, Southern Star and its predecessor were a simple regulated chain, "vertically integrated, fully regulated providers of fully bundled sales, storage and transportation service to utilities at a cost of service rate approved at the federal level."[27] The current industry structure of many different services, buyers, sellers and facilities is much more complex and competitive.[28]

The dramatic and unforeseen changes in the entire structure of the natural gas storage

---

[24]Doc. 119–3 at 8–9.

[25]Doc. 119–2 and 119–5.

[26]Doc. 1-2, Affidavit of Robert S. Bahnick.

[27]Doc. 111–19 at 8.

[28]*Id.* at 8–9.

industry have resulted in substantial economic advantages for the storage operator as follows:[29]

a. The change allows profits for buying, selling, storing, trading, and transportation of natural gas while maintaining FERC regulations on the interstate pipeline operations;

b. Customers are utilizing storage capacity to make additional profits from price movements and seasonal price volatility;

c. Companies such as Southern Star are allowed to charge market based rates that reflect what the market will bear and not what the actual services cost, allowing them to earn more money for storage service;

d. The volume of storage available enables Southern Star to serve its customers who engage in a wide variety of market practices, such as hedging prices. These services, which were made possible by the advent of Order 636 include new tariff rates such as the market based rates (FSS Tariff) as used by marketers to support their economics;[30]

e. The volume of a storage field, as part of the overall system, is a significant factor in the economics of the company;[31]

f. Changes in the structure of the entire system allow Southern Star to use its entire system which is "reticulated" . . . *i.e.* one that includes many different, often interconnected line segments, to meet market demands from a number of different sources;[32]

g. The traditional utility model allowed a storage field operator to recover all of its costs

---

[29]*Id.* at 8–9, 15–16.

[30]Doc. 119–3 at 11–12, 15.

[31]*Id.* at 15.

[32]*Id.* at 5.

in his rates;[33]

h.  Southern Star however, is not restricted to compensation for its costs in amounts in place in 1959, but rather, files periodic rate cases before the FERC to account for changes in costs and expenses.  The last rate case was filed by Southern Star in 2008 and they expect to file another case in December 2013;[34] and

I.  Southern Star routinely injects and withdraws more gas into the Alden Storage field than its certificated capacity.  This is possible because it does so throughout the year on multiple, often daily, occasions. The volumes of storage capacity are a significant component of the economics of the company.[35]

The current fair rental value for gas storage in the Alden Field would result in an annual payment to exercise the annual renewal option in varying amounts (based on the volumes of injections and withdrawals from the field), which in the past ten years would have fluctuated from a low of $17.57 per acre per year, to a high of $44.80 per acre per year.[36]

III.    **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[37] In applying this standard, the court views the evidence and all reasonable inferences therefrom in

---

[33]Doc. 111–19 at 11.

[34]Doc. 119–3 at 20.

[35]*Id.* at 15.

[36]Doc. 111–20 at 18.

[37]Fed. R. Civ. P. 56(a).

the light most favorable to the nonmoving party.[38] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[39] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[40] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[41]

Once the movant has met the initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[42] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[43] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[44]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of

---

[38]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[39]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[40]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[41]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[42]*Anderson,* 477 U.S. at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[43]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[44]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670-71); *see Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

every action."[45]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[46]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[47]

## IV.    Discussion

The facts in this case are generally uncontested by the parties.  Although Plaintiffs argue that they are entitled to a factual review at trial, Southern Star has not contested Plaintiffs' factual allegations for purposes of summary judgment, and the Court is accepting Plaintiffs' factual assertions as true for purposes of summary judgment. The parties agree that this case is governed by Kansas law.[48]

Courts have traditionally taken the view that "competent adults may make contracts on their own terms, provided they are neither illegal nor contrary to public policy, and that in the absence of fraud, mistake or duress a party who fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to him."[49]  This rule applies regardless of a party's failure to read the contract and "even applies when the contract turns out to be disadvantageous to the complaining party."[50]  "However, the rule has been

---

[45]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[46]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[47]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[48]Doc. 125 at 2.

[49]*Wille v. Sw. Bell Tele. Co.*, 549 P.2d 903, 905 (Kan. 1976) (citation omitted).

[50]*John Deere Leasing Co. v. Blubaugh*, 636 F. Supp. 1569, 1572 (D. Kan. 1986) (citing *Wille*, 549 P. 2d at 905).

qualified by the doctrine of unconscionability."[51]

*Wille v. Southwestern Bell Telephone Co.*, is the seminal Kansas case on

unconscionability.[52]  After noting the difficulty of precisely defining unconscionability, the *Wille*

court listed ten factors that courts have used to determine whether a specific transaction is

unconscionable:

> (1) The use of p[r]inted [sic] form or boilerplate contracts drawn
> skillfully by the party in the strongest economic position, which
> establish industry wide standards offered on a take it or leave it
> basis to the party in a weaker economic position . . . (2) a
> significant cost-price disparity or excessive price; (3) a denial of
> basic rights and remedies to a buyer of consumer goods . . . ;
> (4) the inclusion of penalty clauses; (5) the circumstances
> surrounding the execution of the contract, including its commercial
> setting, its purpose and actual effect . . . ; (6) the hiding of clauses
> which are disadvantageous to one party in a mass of fine print
> trivia or in places which are inconspicuous to the party signing the
> contract . . . ; (7) phrasing clauses in language that is
> incomprehensible to a layman or that divert his attention from the
> problems raised by them or the rights given up through them;
> (8) an overall imbalance in the obligations and rights imposed by
> the bargain; (9) exploitation of the underprivileged,
> unsophisticated, uneducated and the illiterate . . . ; and
> (10) inequality of bargaining or economic power.[53]

The *Wille* factors are not particularly helpful in this case.  Plaintiffs concede that there

was no duress, coercion or mistake in the negotiation and execution of the gas storage leases.

Nor do they allege fraud, breach of contract, bad faith, improper self-dealing, or any kind of

illegal activity or misconduct on the part of Southern Star or its predecessors.  Plaintiffs do not

allege that the annual rental rate in the gas storage leases was below market value at the time the

---

[51]*Id.*

[52]549 P.2d 903 (Kan. 1976).

[53]*Id.* at 906–07 (citations omitted).

15

leases were executed.

Rather, Plaintiffs argue that the market for gas storage leases has changed dramatically over the years due to factors unforeseeable at the time the leases were entered into, rendering the rent payable under the leases well below current fair market rent.  Plaintiffs argue that these unforeseen changes have dramatically changed the entire industry so as to alter the equitable balance between lessor and lessee and render the annual option payment unconscionable.

Southern Star argues that unconscionability is judged at the time a contract is executed, and market changes that occur later are not sufficient grounds for equitable reformation. However, Kansas courts have held that:

> [d]espite the general rule that the trial court will look to the
> circumstances as they existed at the inception of the contract rather
> than in the light of subsequent events to determine whether the
> agreement is conscionable, a court is not powerless in equity to
> remedy that which it perceives as present unconscionability.[54]

The courts have relied on the rules concerning specific performance as well as the Uniform Commercial Code in making an unconscionability determination.[55]  Plaintiffs' arguments rely on the courts' emphasis on foreseeability when making such a determination. While focusing on the rules surrounding the doctrine of specific performance, the court in *Wirtz*, noted that:

> The rule against specific performance has been said to apply only
> where the consequences of enforcement cannot be deemed to have
> been contemplated by the parties when the contract was made.
> Hence, hardship, fairly and voluntarily assumed as part of the

---

[54]*Estate of Link v. Wirtz*, 638 P.2d 985, 988 (Kan. App. 1982).

[55]*See id.* ("Although this case deals with a party seeking to have the court reform a contract, the rules concerning specific performance of contracts are applicable."); *Wille*, 549 P.2d at 905–06 ("The doctrine . . . received its greatest impetus when it was enacted as part of the [UCC] . . . many courts have extended the [UCC] by analogy into other areas of the law.").

contract sought to be enforced, cannot prevail to stay a specific
performance thereof, and a bad bargain, in the absence of fraud,
will not relieve a party from specific performance.[56]

Plaintiffs thus set forth the unforeseeable changes in the entire structure of the natural gas storage industry and rely on the court's rulings in *Jensen*[57] and *Kansas Baptist Convention*[58] in support of their arguments. Southern Star argues that *Jensen* and *Kansas Baptist Convention* involved compelling equitable factors that are not present in the instant case.

In *Kansas Baptist Convention*, the landowner plaintiff, Kansas Baptist Convention ("KBC") sued to avoid or reform their 1952 unitization contract with the defendant, oil and gas operator, Mesa.[59] The 1952 contract required Mesa to produce KBC's 640-acre gas unit with reasonable diligence and gave Mesa the right to drill such wells as it deemed necessary in order to do so.[60] The contract also provided that a fixed price of $.10 per Mcf would be paid for all gas produced and that KBC would bear drilling costs and expenses on the gas unit in proportion to its ownership interest.[61] KBC could either pay these costs and expenses, or Mesa could withhold from its gas purchase payments to KBC until it was reimbursed for the costs and expenses incurred.[62]

Although this arrangement worked when the first two wells were drilled on the gas unit,

---

[56] *Wirtz*, 638 P.2d at 989.

[57] *Jensen v. Sw. States Mgmt. Co.*, 629 P.2d 752 (Kan. App. 1981).

[58] *Kan. Baptist Convention v. Mesa Operating Ltd. Ptshp.*, 864 P.2d 204 (Kan. 1993).

[59] *Id.* at 206.

[60] *Id.* at 207.

[61] *Id.*

[62] *Id.*

when Mesa decided to drill a third well on the gas unit the drilling costs had increased so significantly that Mesa knew KBC's share of the operating expenses, drilling expenses and interest would never be recovered by the $.10 per Mcf gas purchase price provided in the contract.[63] Despite this knowledge, Mesa chose to drill the third well for its own benefit.[64] Over the same period of time, the fair market value of gas had also increased greatly, but with the fixed-price contract, that market increase could only benefit Mesa, not KBC.[65]

The court concluded that Mesa had breached its contract with KBC, when it elected to drill the third well.[66] The court discussed at length Mesa's breach of its duty of good faith to KBC (the court found that Mesa had no contractual obligation to drill the well), describing Mesa as an "overreaching lessee" and noting that the lower court described the situation as "effectively transfer[ing] all natural gas owned by plaintiffs to defendant."[67] The court noted that Mesa knew drilling the third well at current costs would extinguish KBC's economic benefits under the contract and permit Mesa to produce KBC's natural gas without any compensation to KBC for the gas produced from its property.[68] The court found that to enforce the original contract would work a substantial hardship on plaintiffs.[69]

In *Jensen*, the landowner-plaintiffs wanted to sell their 2,040 acre ranch, but the property

---

[63]*Id.* at 207–08.

[64]*See id.* at 208–09.

[65]*See id.*

[66]*Id.* at 218.

[67]*Id.* at 216.

[68]*Id.* at 208.

[69]*Id.* at 218.

was subject to a recorded mineral deed that gave the mineral interest owner the option to purchase the surface of 880 acres of the ranch for a payment of only $70 or $75 per acre.[70]  With the far-below-market-value option outstanding, the plaintiffs' prospective purchaser "could not obtain a commercial loan so long as it appeared of record that 880 acres might be taken from the purchaser upon payment of $70 per acre for part and $75 per acre for the rest."[71]  The mineral deed thus created a paralyzing cloud on the title to the ranch, and made it impossible for the plaintiffs to sell their property at a reasonable price.[72]

In *Wirtz*, the Kansas Court of Appeals considered the decision in *Jensen* but reached a "contrary conclusion."[73]  The court refused to reform a lease with an annual rent of $200 per year even though the fair market value was $720 per year.  The court noted:

> The economic climate in the 50's, especially after the postwar recovery from the great depression, was such that it would be reasonable to assume that the parties to this twenty year lease, which provided for an option for an additional twenty years, contemplated with certainty that the value of the lease property would increase over the twenty or forty year period.[74]

The court in *Wirtz*, found that "no real hardship or injustice would result from the enforcement of the lease."[75]

These cases all focused on the presence of or lack of undue hardship.  Therefore, the Court must consider whether this case presents a situation involving undue hardship.  Courts will

---

[70]*Jensen*, 629 P.2d at 753.

[71]*Id.* at 754.

[72]*See id.* at 755–56.

[73]*Wirtz*, 638 P.2d at 989.

[74]*Id.*

[75]*Id.*

not relieve a party from a "bad bargain," therefore "undue hardship" must encompass more than loss of value over time. Plaintiffs argue that:

> the change in circumstances is not premised solely on pure price changes, but rather in the entire structuring of an industry caused by governmental policy and regulatory changes, not market conditions. These changes were undeniably unforeseen at the time of the leases and which makes the underlying economic relationship of the parties so inherently unequal and unfair as to be unconscionable.[76]

Plaintiffs argue that it is not just price changes, but that "the change in economic opportunities, the use of the gas storage capacity and market based rates all of which have flowed from regulatory changes which make the value of the storage enormously more valuable to the storage operator."[77]

The crux of Plaintiffs' argument is that those industry changes have allowed Southern Star to make more money from its customers, not that the changes have caused an undue hardship on Plaintiff. The court in *Wille* distinguished between a situation where a party stands to lose everything they have invested, and a situation where a party is no worse off than if they had made no contract at all.[78]

Plaintiffs ask the Court, in equity, to remedy this alleged "equitable imbalance" by reforming Plaintiffs' leases to require Southern Star to share the alleged increased profits with Plaintiffs, in spite of their agreement for a fixed-rate rent. In any long-term lease, the passage of time is likely to make it more favorable to one of the parties. Thus, each party takes the risk that future events will disadvantage the party's economic position. The Court cannot allow a party to

---

[76]Doc. 119 at 22.

[77]Doc. 119 at 26.

[78]*See Wille*, 549 P.2d at 908.

enforce a lease when it is economically productive and repudiate or reform it when the assumed

risks make it less productive.  This is especially true in this case, where Plaintiffs seek to reform

the provision that has become disadvantageous, while leaving intact the provision that has

proved to be beneficial with the passage of time.

Southern Star argues that Plaintiffs' unconscionability argument fails to take into account

the gas storage leases in their entirety, including valuable compensation in addition to the

$1/acre rent.[79]  Plaintiffs ignore a separate provision of the gas storage leases that grants

Plaintiffs the right to receive free and/or reduced-price natural gas ("Domestic Gas") at Southern

Star's expense.  Southern Star's obligation to provide this free and/or reduced-price Domestic

Gas continues into the future.  Southern Star argues that the very changes in the natural gas

industry that the Plaintiffs tout as the basis for reforming the annual rental provisions of the

leases, have also increased the cost to Southern Star (and the corresponding benefit to Plaintiffs)

of that free and reduced-price gas.[80]  Plaintiffs' right to receive this Domestic Gas is additional

compensation under the gas storage leases and cannot be ignored in the analysis of their

unconscionability argument.

Plaintiffs respond by arguing that the free gas clause was not part of the annual base

rental for the lease for the gas storage, and is more like rental for the location of a well on the

land.  However, the Domestic Gas element of compensation encompasses two paragraphs of

Plaintiffs' gas storage leases dealing with the right to gas at the principal dwelling on the leased

---

[79]Southern Star also argues that the Plaintiffs who have received Domestic Gas pursuant to their leases
should be estopped from obtaining equitable relief through reformation of their leases.  The Court need not address
this issue in light of the denial of reformation applicable to all Plaintiffs.

[80]*See* Attachment A to Exhibit 24 to Memorandum in Support of Defendant's Motion for Summary
Judgment, Doc. 111-24 at 3 (showing the increase in the annual average residential natural gas price in Kansas since
1958).

properties. The gas storage leases provide specifically for (a) free gas (which in some cases is available only if a well is placed on the property); and/or (b) reduced-price gas at $.50 per Mcf. Plaintiffs refer solely to the "free gas" provision, ignoring the following reduced-price gas provision contained in all of the gas storage leases:

> After commencement of storage of gas under or in the vicinity of said land and until a well exists on said land which Lessee uses in introducing or removing gas in connection with the storage of gas in said land, Lessee agrees within thirty days after Lessor's written request therefor to install a meter and appurtenant facilities on a site on Lessee's pipe line nearest said land and sell or cause to be sold gas to Lessor for domestic use at the principal dwelling house on said land at a price of 50 cents per thousand cubic feet. . . .[81]

Pursuant to this provision, all Plaintiffs have the right to receive gas to the principal dwelling on their leased property at a price of only $.50 per Mcf and this right is not contingent upon Southern Star drilling a well on their property.

The right to receive gas at $.50 per Mcf is a right of compensation that all Plaintiffs have, in addition to their annual rental payment. This is a very valuable right, as average residential natural gas rates in Kansas over time have been many multiples greater than $.50 per Mcf.[82] Plaintiffs cannot discount this right as compensation for Southern Star locating storage wells on Plaintiffs' properties, because Plaintiffs have the right to reduced price Domestic Gas irrespective of whether Southern Star has a storage well on their properties.

Plaintiffs also argue that Domestic Gas cannot be additional consideration for Plaintiffs' leases because it is not mentioned in the paragraph of the leases specifically addressing consideration, as follows: "the consideration recited in paragraph 1 hereof, together with the

---

[81]*See, e.g.,* Doc. 111–2 at 2, ¶ 4(c). The language may vary slightly, but not materially, among the various gas storage leases at issue.

[82]*See* Doc. 111–24, Affidavit of Kevin Gray.

herein provided annual payment, shall operate, cover and be held to be full consideration and

compensation to Lessor for all privileges, rights and each option granted Lessee under this lease,

except only as otherwise provided in this lease."[83]  This language, however, does not prohibit

free and/or reduced price natural gas as additional consideration.  In fact, the quoted provision

contemplates other potential consideration "as otherwise provided in [the] lease."

The Court finds that it cannot look at the provision dealing with the annual rental

payment in isolation.  In this case, equity requires the Court to look at the contract as a whole

when determining unconscionability and whether an undue hardship exists.  The Supreme Court

of Kansas has stated:

> Equity does not require, before enforcing a contract, that it be
> shown to be profitable to the party required to perform it.  It is
> usually not necessary to invoke the action of the court to compel
> performance under such circumstances.  Equity does refuse to
> enforce a contract, even though legal, in which the party seeking
> the redress has so far overreached his adversary, or for some other
> cause that the contract is unconscionable.  This provision of the
> contract does, indeed, seem burdensome to appellant; but this
> matters little.  The contract is to be considered as a whole.[84]

Furthermore, the gas storage leases have not created a cloud on the title to the property

such as that found to create an undue hardship in *Jensen*.  In fact, various properties with gas

storage leases have been exchanged after the unforeseeable industry changes took place in this

case.  Eleven of the Plaintiffs[85] acquired their properties by Deeds executed well after the gas

---

[83] Doc. 119 at 8.

[84]*Chanute Brick & Tile Co. v. Gas Belt Fuel Co.*, 109 P. 398, 399 (Kan. 1910).

[85]Drew Frederick, Connie Jo Frederick, Lance Frederick, Lynett Frederick, Zachary Salter, Marlin Regehr, Craig Bennett, Janelle Bennett, V.J. Proffitt, Jacquielyn Proffitt, and Sheryl Beth Carter.

storage leases encumbering their properties were filed of record.[86]  Those eleven Plaintiffs

acquired their properties subject to the gas storage leases with knowledge of the $1 per acre per

year annual rental provision, at various times between 1990 and 2008, well after the alleged

"unforeseeable industry changes" were under way.[87]

## V.    Conclusion

The Court finds that the unforeseeable market changes present in this case, without some

other factor creating an undue hardship, are insufficient to render the gas storage leases

unconscionable.  This conclusion is further supported by the fact that Plaintiffs have the right,

which some Plaintiffs have taken advantage of, to receive free and/or reduced-price gas from

Southern Star.  Plaintiffs cannot argue for equitable reformation of one term in the lease that has

proved disadvantageous to them, while arguing against reformation of another term that has

proved beneficial by virtue of the same changes in market conditions.

Plaintiffs maintain that summary judgment is inappropriate and that they are entitled to

present evidence on their claim of unconscionability.  However, as stated earlier, the Court

accepted all of Plaintiffs' factual assertions as true for purposes summary judgment.  Where the

party asserting unconscionability fails to show any facts that would tend to show

unconscionability, summary judgment is proper.  Plaintiffs had the opportunity in summary

judgment briefing to present sufficient evidence of unconscionability but failed to do so.[88]

Plaintiffs' have failed to assert facts showing an undue hardship or other grounds for contract

---

[86]Doc. 111–25.

[87]*See* Doc. 111–25.1 to 25.9 (Deeds produced by Plaintiffs during discovery).

[88]*Benson Mineral Grp, Inc. v. N. Nat'l Gas Co.*, Case No. 86-1903 (J. Theis), 1988 WL 404348 at *9 (D. Kan. April 29, 1988) (granting summary judgment on the unconscionability defense).

reformation.  A party may not escape summary judgment in the mere hope that something will

turn up at trial.

      **IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion Seeking

Permission to File a Sur-Reply Brief (Doc. 124) shall be GRANTED.

      **IT IS FURTHER ORDERED BY THE COURT**  that Defendant's Motion for

Summary Judgment (Doc. 110) is GRANTED.

      **IT IS SO ORDERED.**

Dated: <u>May 9, 2013</u>

                                    <u>S/ Julie A. Robinson</u>
                                    JULIE A. ROBINSON
                                    UNITED STATES DISTRICT JUDGE